# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| GODWIN EHIREMEN, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 14-CV-292-GKF-FHM |
| STANLEY GLANZ, SHERIFF OF TULSA COUNTY, in his official capacity, | ) ) ) ) |
| Defendant. | ) ) |

## OPINION AND ORDER

Before the court is the Motion for Summary Judgment filed by defendant Stanley Glanz, former Sheriff of Tulsa County, in his official capacity as head of the Tulsa County Sheriff's Office ("TCSO"). [Dkt. #35]. Plaintiff Godwin Ehiremen[1] ("Ehiremen") claims TCSO terminated his employment on the basis of his race—African American—and national origin—Nigerian—in violation of 42 U.S.C. § 1981.

Ehiremen was a detention officer in the Tulsa County jail. On December 19, 2012, an inmate filed a written grievance, which alleged Ehiremen had made inappropriate sexual advances towards several female inmates. Thereafter, Deputy Scott Dean of TCSO's internal affairs division conducted an investigation regarding Ehiremen's conduct. Dean's investigation concluded, *inter alia*, that Ehiremen had given his phone number to a female inmate and had made sexual advances towards multiple inmates. Following Dean's investigation, a disciplinary panel (the "panel") held a hearing to allow Ehiremen to address Dean's findings. During the

---

[1] The Amended Complaint misspells the plaintiff's last name as Ehirem*a*n. The proper spelling is Ehirem*e*n. [*See* Dkt. #35-4, pp. 5.1 to 5.9].

hearing, Ehiremen admitted to giving his phone number to an inmate and to promising to take an inmate on a date after she was released. After the hearing, the panel terminated Ehiremen.

## I. Legal Standard

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Federal Rule of Civil Procedure 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). A court must examine the factual record in the light most favorable to the party opposing summary judgment. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995).

When the moving party has carried its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted). In essence, the inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

**II.     Analysis**

A court considers a racial discrimination claim under § 1981[2] using the *McDonnell Douglas* burden shifting framework.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *see Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1166-67 (10th Cir. 2007).  Under *McDonnell Douglas*, a plaintiff must first make a *prima facie* case of employment discrimination.  *See* 411 U.S. at 802.  Next, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment decision.  *Id.*  Finally, if the defendant carries its burden, the burden shifts back to the plaintiff to show that the defendant's stated nondiscriminatory reason is mere pretext for unlawful discrimination.  *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1114-15 (10th Cir. 2007).  The parties agree that Ehiremen has made a *prima facie* case and that TCSO has articulated a legitimate, non-discriminatory reason for terminating him.  Specifically, TCSO claims it terminated Ehiremen because he violated TCSO's anti-fraternization policy by giving his phone number to an inmate, promising to date an inmate after she was released, and otherwise establishing inappropriate relationships with female inmates.  TCSO argues it is entitled to summary judgment because Ehiremen has not shown that its decision to terminate him was a pretext for discrimination on the basis of race or national origin.

There are two ways to demonstrate pretext—providing evidence that the "defendant's stated reason for the adverse employment action was false," or demonstrating that the employer "treated the plaintiff differently from other similarly-situated employees who violated work rules

---

[2] "In racial discrimination suits, the elements of a plaintiff's case are the same whether that case is brought under 42 U.S.C. §§ 1981 or 1983 or Title VII."  *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008) (quoting *Baca v. Sklar*, 398 F.3d 1210, 1218 n.3 (10th Cir. 2005)); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000).

of comparable seriousness." *Swackhammer*, 493 F.3d at 1167-68 (internal quotations omitted). Ehiremen argues the evidence supports both methods of showing pretext.

### A. Falsity

Ehiremen argues the panel terminated him because of his race and national origin, not because of his prohibited interactions with female inmates. The parties' briefs and evidentiary materials do not reveal or refer to any direct evidence of a discriminatory motive for Ehiremen's termination. However, direct evidence of discriminatory intent is not necessary to defeat summary judgment. Rather, a plaintiff can show falsity by producing evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quoting *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951-52 (3d Cir. 1996)).

Ehiremen argues the panel's stated rationale for termination is unworthy of credence for several reasons. First, Ehiremen notes that Chief Weigel, a member of the panel, referred to a woman named Veranda during the panel's deliberations. [Dkt. #38-8, pp. 46-47]. None of the inmates or TCSO employees involved in the Ehiremen investigation was named Veranda. Ehiremen argues Chief Weigel's reference to Veranda indicates he was considering another inmate not in the evidence. This argument is not persuasive. The transcript shows that Chief Weigel and other members of the panel were confused as to the name of one of the individuals involved. [*Id.*]. At least two of the individuals discussed in the investigation report had names similar to Veranda—Tamra and Barhonda. [*See id.*]. There is no indication in the transcript that Chief Weigel was referring to another inmate not discussed earlier in the record.

4

Next, Ehiremen argues Captain Merchant, another member of the panel, inappropriately disregarded Ehiremen's statement to the panel because he characterized Ehiremen's admission that he had given his phone number to an inmate as the only part of Ehiremen's statement "that really made any sense." [Dkt. #38-8, pp. 43-44]. In fact, Merchant said that Ehiremen's admission was the "only thing in the last 15 minutes that has really made any sense to me related to why we are here." [*Id.*]. Ehiremen gave a lengthy narrative statement to the panel, discussing his interactions with inmates and several alleged incidents of racial discrimination. [*Id.* at 23-43]. Merchant's statement appears to be an assessment of the relevance of the other parts of Ehiremen's narrative. In any event, Ehiremen's interpretation of Merchant's statement as evidence that Merchant either did not try to understand Ehiremen's narrative or chose not to believe certain parts of Ehiremen's narrative because of Ehiremen's race or national origin finds no support in the transcript and is speculative.

Ehiremen argues the statements of inmate Erin MacKool were so inconsistent that the panel could not have relied on them in good faith. MacKool was one of several female inmates whom Ehiremen escorted to and from classes. On January 3, 2013, Tonya Hinshaw, a TCSO employee, reported a conversation she had with MacKool in early December 2012 in which MacKool claimed that "when you don't want to flurt with Ehiremen anymore he starts being mena to you and dont bring you and candy or coffee[.]" [Dkt. #38-20, p. 1 (*sic* throughout)]. Hinshaw noted MacKool said her problems with Ehiremen were the reason "she don't go to class as often." [*Id.*]. Hinshaw suggested that MacKool should file a grievance. MacKool filed a grievance on December 19, 2012, in which she claimed Ehiremen "made innappropriate [*sic*] conduct and sexual advances to several inmates including myself," and that because she did not respond to these advances, Ehiremen would not "allow [MacKool] to attend [her] classes . . . ."

5

[Dkt. #38-5, p. 1].  Ehiremen argues these two statements are so contradictory that they amount to "proof of a fabricated story being slowly concocted." [Dkt. #38, p. 17].  In explaining the alleged contradiction, Ehiremen interprets[3] Hinshaw's report as stating that MacKool *chose* not to attend class because Ehiremen did not show her favoritism when she stopped flirting with him. By contrast, Ehiremen interprets MacKool's grievance as stating that Ehiremen not only stopped giving her candy and coffee when she stopped flirting with him, but affirmatively prevented her from attending class.

The transcript of the panel's deliberations prior to terminating Ehiremen shows the panel relied primarily on Ehiremen's admission that he gave an inmate his phone number and promised to see her after she got out, not on other evidence of inappropriate relationships referenced in MacKool's statements.  It is true that at least one panel member, Major Bowman generally referred to the evidence of Ehiremen establishing relationships with an inmate. [*See* Dkt. #35-8, p. 46].  The transcript of Bowman's comments does not reference MacKool's statements specifically, but it is possible he relied on them in part. [*See id.*].  Nevertheless, in both accounts, MacKool claimed Ehiremen showed inappropriate favoritism.  The court concludes the purported inconsistency in MacKool's statements—whether Ehiremen prevented her from going to class or merely discouraged her from going to class by not offering her candy or other signs of favoritism—is not the kind of inconsistency that could lead a reasonable fact finder to conclude that Major Bowman's independent determination that Ehiremen attempted to "create some sort of relationship" with female inmates was pretext "unworthy of credence," or that Bowman and the other panel members "did not act for the asserted nondiscriminatory reason[.]" *Morgan v. Hilti*, 108 F.3d 1319, 1323 (10th Cir. 1997).

---

[3] For summary judgment purposes, the court adopts Ehiremen's interpretations of these statements, although the court notes that the statements bear other interpretations.

6

Ehiremen also argues the panel's decision is "unworthy of credence" because the panel members did not give adequate weight to Ehiremen's defenses, specifically that giving inmates candy was within the scope of Ehiremen's duties, and that another TCSO employee, Chaplain Hardgrave, told Ehiremen it was acceptable for a detention officer to give an inmate his phone number. These arguments are not persuasive. The fact that the panel did not interpret the evidence as Mr. Ehiremen would have liked, or that the panel was not persuaded by his defenses, is not adequate, as a matter of law, to establish pretext. A plaintiff must be able to show that the employer's explanation was "so weak, implausible, inconsistent or incoherent that a reasonable fact finder could conclude that it was not an honestly held belief, but rather was subterfuge for discrimination." *Young v. Dillon Co., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (citing *Rivera v. City and County of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004)). The panel's rejection of Ehiremen's arguments and defenses does not rise to that level. It is not the court's role to reweigh the evidence that resulted in termination, acting as a "'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Id.* (citing *Jones v. Barnhart*, 349 F.3d 1260, 1267 (10th Cir. 2004)).

Ehiremen argues Deputy Stacey Holloway may have conspired with some of the inmates to fabricate the grievance filed by inmate Erin MacKool on December 19, 2012. Ehiremen did not present this theory to the panel or to anyone else at TCSO before he was terminated. Thus, Ehiremen's argument is essentially that the panel, if their decision was truly based on unbiased assessments of the evidence, would have realized Holloway conspired with inmates to fabricate the grievance based on what Ehiremen argues are inconsistencies in Holloway's statements and MacKool's grievance. Specifically, in a memo dated December 19, 2012, Holloway reported a conversation she had with three female inmates—Erin MacKool, Barhonda Hammer, and Kerry

7

Boyd—in which the inmates told her Ehiremen flirted with female inmates and was "seeing" former inmate Amber Neal. [Dkt. #38-6, p. 1]. In addition, Holloway reported that Ms. Hammer told her Ehiremen was "corresponding by mail with a friend of hers named Lacey who was also a former inmate." [*Id.*]. In an affidavit dated January 13, 2016 and submitted with TCSO's Motion for Summary Judgment, Holloway reported the conversation with the three inmates, but did not include the statement by Ms. Hammer regarding her friend Lacey. [Dkt. #38-12, p. 2].

Ehiremen also notes Holloway reported explaining to MacKool that MacKool, Hammer, and Boyd could not attend class "due to security reasons . . . until certain things had been checked out" and because the officers determining who could attend class "had to be fair with the waiting list." [Dkt. #38-6, p. 1]. And yet, in MacKool's grievance, filed the same day, MacKool blamed Ehiremen for not allowing her to attend classes because she stopped flirting with him. [*See* Dkt. #38-5, p. 1].

Ehiremen's arguments based on these purported inconsistencies are not persuasive. Holloway's original memo contains one additional allegation not included in her affidavit, but the two statements are not inconsistent or contradictory. The record contains no evidence that might explain why MacKool claimed Ehiremen prevented her from going to class after Holloway gave her other reasons she could not attend class. However, no reasonable fact finder would infer that these minor discrepancies are, as Ehiremen argues, "proof of a fabricated story being slowly concocted" by Holloway and the female inmates. [Dkt. #38, p. 17].

Ehiremen also advances a "subordinate bias" or "cat's paw" theory of liability. *See Lobato v. New Mexico Env't Dep't*, 733 F.3d 1283, 1294-95 (10th Cir. 2013). The "cat's paw" theory "refers to a situation in which a biased subordinate, who lacks decision-making power,

8

uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006). To prevail on a subordinate bias theory in the Tenth Circuit, an employee "must establish more than mere 'influence' or 'input' in the decision-making process." *Id.* at 487. Rather, the employee must show that "the biased subordinate's discriminatory reports, recommendation, or other actions caused the adverse employment action." *Id.*

During TCSO's internal investigation and in his deposition in this case, Ehiremen claimed that several TCSO employees made racially derogatory statements or otherwise discriminated against him based on his race or national origin. For example, Ehiremen stated Deputy Holloway instructed him not to put any black inmates in the GED class unless she approved them first. [Dkt. #35-4, p. 17].[4] There is no indication in the record that the panel's termination decision was influenced by any of the purported racist statements Ehiremen attributed to his coworkers, much less that those statements *caused* the termination decision.

Furthermore, the causal link between a subordinate's bias and the adverse employment action can be severed when an employer conducts an independent investigation, rather than relying on the subordinate's "reports, recommendation or other actions." *See Lobato*, 733 F.3d at 1295. The record shows Internal Affairs Deputy Scott Dean independently investigated

---

[4] Ehiremen also references four other racial discrimination cases against TCSO filed in this court by Ehiremen's counsel. Three of those cases have settled, and in none of them has the court made any factual rulings that might support Ehiremen's argument. The court cannot rely on *allegations* in those cases as evidence to defeat summary judgment in this case. *Lawmaster v. Ward*, 125 F.3d 1341, 1349 (10th Cir. 1997) ("mere allegations, without more, are insufficient to avoid summary judgment."). Ehiremen's general reference to those cases did not identify any specific part of the records therein or ask this court to take judicial notice thereof. Accordingly, the court need not consider evidence that is not part of the record in this case. *See* 10A Fed. Prac. & Proc. § 2723 ("Although the principles of judicial notice are available, a judge may not resolve a summary-judgment motion by 'assumptions' about matters that have not been properly presented in the manner prescribed by [Rule 56] or that are not the subject of the judicial-notice doctrine. For example, it is improper for a judge to base summary judgment upon personal knowledge and reactions to matters appearing in other cases with which the judge has some familiarity if these matters do not appear in the pleadings, depositions, admissions, answers to interrogatories, or affidavits of the parties in the case before the court.").

Ehiremen's allegations of racial discrimination and included specific responses to those allegations in his investigation report.[5] [Dkt. #35-7, pp. 27-31]. As a result, even if these other subordinates were biased against Ehiremen, and even if one or more of them "alerted [TCSO] to [Ehiremen's] misconduct[,]" TCSO cannot be held liable for their bias because it did not "uncritical[ly] rel[y]" on their statements. *Lobato*, 733 F.3d at 1294-95. Rather, Deputy Dean "independently verifie[d] the facts" by interviewing the relevant inmates and officers. *Id.* at 1294. Ehiremen has not produced evidence that could support TCSO liability under a "subordinate bias" theory.

### B. Differential Treatment

Although Ehiremen has not demonstrated falsity, he could nevertheless establish pretext by showing he was treated differently from "other similarly-situated, nonprotected employees who violated work rules of comparable seriousness." *Kendrick v. Penske Trans. Serv., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2006). A similarly-situated employee "deals with the same supervisor and is subject to the same standards governing performance evaluation and discipline." *Id.* (internal quotations omitted).

All but one of Ehiremen's examples involve TCSO employees who are not similarly situated. Ehiremen provides the affidavit of Shannon Moody, a former TCSO employee, regarding consensual sexual activity between TCSO employees while on the job. Such conduct

---

[5] The only exception was a new allegation Ehiremen raised at the pre-action hearing of derogatory statements made by an unnamed "supervisor" and other unidentified individuals regarding Ehiremen's request to be transferred to booking. Ehiremen claimed the individuals said, "[D]o you think they really want you in the booking? I said why not? You know, they said to me, you know, the way you are, you know. You know, people like you they don't really want to work over there. You know, they want people who are smart, you know, other – you know, when they said that, I went like, for real? They need people who are very competent, who are sharp minded in there, not people like you." [Dkt. #35-8, p. 32]. These allegations—that unidentified individuals commented on Ehiremen's intelligence and competence in the context of his desire to transfer to booking without referencing his race or national origin—cannot support an inference that the panel's decision to terminate Ehiremen based on a violation of the anti-fraternization policy was motivated by racial discrimination.

is not comparable to Ehiremen's—establishing inappropriate relationships *with inmates*. In her affidavit, Moody also states that during her time at TCSO, she observed "Caucasian employees go behind closed doors with inmates, such as the staff bathroom and there was never any discipline issued, despite this being against policy and there being absolutely no reason for a staff member and an inmate to go into the staff bathroom together." [Dkt. #38-1, p. 3]. Moody's affidavit does not explain who these Caucasian employees were or whether they and Ehiremen shared a supervisor. Furthermore, Moody's time at TCSO ended in April 2007. Shortly thereafter, on May 16, 2007, TCSO adopted the anti-fraternization policy that was the basis of Ehiremen's termination over five years later. [Dkt. #40, pp. 24-25]. "Employers' disciplinary practices necessarily change over time, and it would be inappropriate for courts to penalize employers who have modified their practices over a substantial period of time in an effort to better address their business needs." *Kendrick*, 220 F.3d at 1233-34 (granting summary judgment for failure to establish pretext where comparable situation occurred over a year and a half prior to plaintiff's disciplinary action).

As stated above, one of Ehiremen's examples involved a similarly situated employee. Seth Bowers, a former TCSO detention officer who is white, was accused of engaging in illegal sexual acts with a juvenile female inmate in 2010. Bowers was allowed to resign. Ehiremen argues this is differential treatment because he was not given the opportunity to resign like Bowers. Ehiremen provides no authority that pretext may be inferred from evidence that an employer terminated a minority employee but allowed a similarly culpable, nonminority employee to resign. Courts generally have not considered a terminated employee to have been treated differently from one forced to resign when the employee did not attempt to resign and the employer's policies did not require it to offer the employee the chance to resign. *See Becker v.*

*Omni Air. Intern., Inc.*, 2014 WL 1394193, *9 (N.D. Okla. Apr. 9, 2014); *Monroe v. City of Lawrence, Kans.*, ___ F.3d ___, 2015 WL 5006081, *14 (D. Kans. Aug. 20, 2015). Ehiremen has produced no evidence suggesting he attempted to resign prior to his termination or that policy required TCSO to offer him the option of resigning. Thus, Bower's resignation is no evidence of pretext. *Id.*

### C. Ehiremen's Overbreadth and Vagueness Argument

Finally, Ehiremen raises a new argument not asserted in his Amended Complaint. He argues the anti-fraternization policy is constitutionally overbroad and vague. Ehiremen may not, at this late date, claim a new constitutional violation. As it relates to his pending claim, Ehiremen's argument is that because the anti-fraternization policy is vague and overbroad, it could easily be applied in a discriminatory way. This argument does not create a genuine issue of material fact as to pretext. Even if the court were to conclude the anti-fraternization policy is vague and overbroad, Ehiremen has nevertheless failed to raise a genuine issue that the stated reason for his termination was false, or that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness.

### III. Conclusion

The court concludes Ehiremen has failed to establish a genuine issue of material fact that he was terminated in violation of § 1981.

WHEREFORE, Glanz's Motion for Summary Judgment [Dkt. #35] is granted.

IT IS SO ORDERED this 21st day of March, 2016.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT